UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CARMELITA HARMS,

     Plaintiff,

v.

UNITED STATES OF AMERICA,

     Defendant.

Case No. 15-cv-13215
Honorable Laurie J. Michelson
Magistrate Judge Anthony P. Patti

---

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [24]**

---

Plaintiff Carmelita Harms was stopped on I-94 in Michigan when her vehicle was rear-ended by a vehicle driven by Federal Bureau of Investigation Agent Mark Davidson. Harms asserts that the impact caused or exacerbated neck and back injuries and has sued the federal government pursuant to the Federal Tort Claims Act. For the reasons set forth below, Defendant's motion will be granted in part and denied in part.

## I.

The summary-judgment record reflects the following facts. Where there are disputes, the Court views the facts in the light most favorable to Plaintiff, the non-moving party.

### A.

In February 2005, Harms began working as a custodian at Centerline Schools. (R. 24-2, PID 135.) According to the job description, the position required the ability to "frequently lift and/or move upwards of 90 pounds" and to "sometimes" use "ladders/lifts/scaffolds" and work at "heights upwards of 90 feet." (R. 24-3, PID 160.) According to Harms' deposition testimony, during the school year "you just sweep, mop, vacuum, take out garbage," but "in the

summertime, it's more harder, it's lifting furniture, moving furniture, using big, heavy machines." (R. 24-2, PID 145.)

In September 2009, Plaintiff fell at work and was subsequently treated for wrist, ankle, shoulder, neck, and back pain by Dr. Walter Klimkowski at St. John Oakland Hospital. (R. 24-4, PID 161.) She was diagnosed with "cervical strain." (*Id.*) Plaintiff continued to experience pain for several years. (*See* R. 24-4.)

But Harms' continuing issues were not in her neck. In November 2009 she was treated for a "lumbar strain," (*Id.* at PID 164), treated for a "flare up of chronic back pain," (R. 27-3, PID 462) and given work restrictions. On August 23, 2010, she was treated for another "lumbar muscle strain" (*Id.* at PID 169) with related work restrictions. Shortly before this, on August 8, 2010, she reported "lower back pain into leg" in a health history form. (R. 24-4, PID 171.) In August 2011, Plaintiff reported lumbar pain radiating into her leg. (*Id.* at PID 172.) By September 2011, Plaintiff rated her pain as a "6/10" and reported that she had difficulty lifting and walking. (R. 24-4, PID 174.) Plaintiff was also in physical therapy at this time. (*Id.* at PID 176.) A September 2011 MRI of Plaintiff's spine revealed "[d]isk [sic] herniation . . . asymmetric to the left causing moderate left sided central canal stenosis. This disc herniation appears to contact the exiting left nerve root." (R. 24-5, PID 182.) After being discharged from physical therapy, Plaintiff continued to take pain medication and muscle relaxers. (R. 24-4, PID 177.) At a February 3, 2014 physical with Dr. Walter Klimkowski, Plaintiff reported "back pain, described as dull and aching, starting 4 years ago." (R. 24-4, PID 179.) Klimkowski noted sciatica on Plaintiff's chart, and instructed her to visit the ER if the pain became worse. (*Id.* at PID 180.)

**B.**

On February 19, 2014, Plaintiff was driving a 2010 Ford Fusion on Interstate 94 with her husband in the passenger seat. (R. 24-2, PID 136.) Both were wearing seatbelts. (*Id.*) Traffic was stop and go, at least in Harms' lane. (*Id.*) Harms observed a car swerve into her lane moving "very fast." (*Id.*) The car did not slow down and rear ended Harms' car. (*Id.*) The other driver was Mark Davidson, an FBI agent. (R. 26-4, PID 324.) He testified that he was traveling at approximately 45 to 50 miles per hour when he hit Harms' vehicle. (*Id.* at PID 325.) Harms, her husband, and Davidson exited their respective vehicles, and Davidson apologized, saying that he "dropped [his] phone." (R. 24-2, PID 136.)

Harms' husband testified that Harms had left approximately six feet between her vehicle and the vehicle in front of her, and so her Fusion merely "bumped" that vehicle. (R. 24-8, PID 210.) Post-accident photos of the front of the Fusion show that it sustained a crack in its front bumper. (R. 26-2.) The back of the Fusion sustained more damage. Post-accident photos show that the back windshield shattered completely, and the right side of the trunk and bumper crumpled inward. (R. 26-2.) The State of Michigan Traffic Crash Report stated that there were "[n]o reported injuries," those at the scene refused medical treatment, and that only Davidson's airbags deployed. (R. 24-11, PID 216–17.) Harms testified that although her knees were hurting her immediately after the accident, she did not seek medical attention and just drove home after the accident because the officer told her that she could leave. (R. 24-2, PID 140.) Harms spent the remainder of the day resting at home. (*Id.*)

By the next morning, Harms' "whole body was hurting," and she went to the emergency room later that day. (*Id.*) According to the ER Report, Harms presented with "[complaints] of neck pain, thoracic spine pain and lumbar spine pain along with bilateral rib pain. . . . The

character of symptoms is achy. The degree at onset was moderate. The degree at present is moderate." (R. 24-12, PID 221.) The Report noted that Harms' neck had some tenderness, and her back had "normal" range of motion. (*Id.* at PID 223.) An x-ray of Harms' back was taken, which revealed "Mild osseous degenerative changes without osseous fragmentation[.]" (*Id.* at PID 224.) The report also noted that Harms "refused pain medication in ED." (*Id.* at PID 224.) Harms was discharged with instructions to follow up with Klimkowski within a week, return to ER "as needed," and follow up with the orthopedic department "if pain doesn't improve 7-10 days." (*Id.* at PID 225.)

Harms went back to Klimkowsi's office on February 24, 2014. (R. 24-7, PID 195.) At that time, her "chief complaint" was "f/u [follow-up] from car accident, R ankle pain, heard pop yesterday[.]" (R. 24-7, PID 195.) As to the accident, she denied head injury but reported "headache since: frontal area," that she went to ER but "xrays didn't show anything," and that she was experiencing right shoulder and right neck pain. (*Id.*) As to her ankle, Harms told Klimkowsi, "I fell Sunday night – I stepped off a curb and I felt the worst pain ever shoot from my left foot to my lower back and then my right leg gave out and I fell. Now my right ankle hurts and my foot is cold and tingling up to my knee." (*Id.*) She rated her pain at a 10. (*Id.*) Klimkowski concluded, "The symptoms resulted from a fall." (*Id.*) Klimkowski ordered Vicodin for the ankle pain and gave Harms a note to keep her off work until March 25, 2014. (*Id.* at PID 201.)

Harms returned to Klimkowski's office on March 7, 2014 for a follow up. Her "chief complaint" was "f/u [follow up] for ankle" and "lower/middle back pain, increasingly worse." (R. 24-7, PID 201.) At this visit, Klimkowski referred Harms to physical therapy. (R. 24-7, PID 203.)

Harms returned again on March 19, 2014. (*Id.* at PID 204.) This time, her "chief complaint" was "back pain, increasingly worse since MVA." (*Id.*) She reported that she had taken Motrin "almost everyday since the accident and still has back pain." (*Id.* at PID 204.) She stated that the pain was a 6/10 at worst, an average of 4/10, and 2/10 at the lowest, but it "never totally goes away." (*Id.*) Klimkowski ordered an MRI of Harms' thoracic and lumbar spine. (*Id.*)

In April 2014, on Klimkowski's referral, Harms began treating with Dr. Walter Kornblum. Harms filled out a "Lower Back/Cervical Spine Questionnaire" on April 9, 2014. (R. 24-14, PID 227.) She reported that she had no history of neck pain, but had a history of back pain—"had a pulled disc in lower back 4 years ago did physical therapy and it went away." (*Id.*) In her "History of Present Illness Form," she reported that her back pain stemmed from an injury where she "was hit from behind by another car as we were stopped on freeway and I hit a car in front of my car." (*Id.* at PID 228.) Kornblum ordered an MRI of Harms' cervical spine. (R. 24-15, PID 233.) That MRI revealed "Reversal of the spinal curvature, possibly associated with injury. . . . C3-C4 and C4-C5: Disc bulges, compressing the ventral thecal sac. . . . C6-C7: A posterior disc herniation (protrusion type), compressing the ventral thecal sac." (*Id.*)

By June 9, 2014, Plaintiff's lumbar pain was at a 1/10 and she returned to work without restrictions. (R. 24-14, PID 231–32.) Harms characterized this relief as temporary—she testified that she got help from coworkers upon her return to work and that the pain never really went away. (R. 24-2, PID 145–46.) Plaintiff continued to work full time until November 2014. (R. 24-2, PID 146.) She stopped because she "couldn't do it anymore," but she admits that she did not ask for any accommodations and has not sought other employment since then. (*Id.*)

Kornblum performed a spinal fusion surgery on Plaintiff's neck and back in May and June 2015. (R. 24-6, PID 188.) He testified that Plaintiff could potentially return to her custodian

job at some point, but that he would send her for a functional capacity test first. (R. 24-6, PID 190.) Harms underwent another spinal fusion on March 24, 2016. (R. 24-16, PID 238.) However, Harms reported on September 15, 2016, that her lumbar spine is no better since surgery and her neck has been worse since surgery. (*Id.* at PID 238.)

Harms filed an application for Social Security Disability, which was ultimately denied. (R. 24-18, PID 243.) Harms testified that she can still care for her own personal needs, perform some household chores, do some shopping (sometimes with a motorized cart), and go on a few vacations. (R. 24-2, PID 146, 148, 151–54.) However, Harms testified that her activities were limited during those trips due to her neck and back issues. (*Id.* at PID 151–54.)

Harms filed suit in this Court on September 11, 2015, naming the United States as Defendant. (R. 1.) She claims that "as a consequence of the collision," she suffered injuries leading to "permanent injury and incapacity of disability." (R. 24, PID 111.)

Defendant moves for summary judgment. The Court heard argument on the summary-judgment motion on June 6, 2017. The Court subsequently scheduled a *Daubert* hearing regarding the opinion of Dr. Kornblum, but ultimately cancelled it when Kornblum was unable to appear several times.

## II.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party may discharge its initial summary judgment burden by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party does so, the party opposing the motion "must come forward with specific facts showing that there is a genuine

issue for trial." *Matsushita v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to a jury, or whether the evidence is so one-sided that the moving party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

## III.

Harms brings this suit pursuant to the Federal Tort Claims Act ("FTCA"). Generally, sovereign immunity provides a full defense for any federal government entity, agency or employee. *Premo v. United States*, 599 F.3d 540, 544 (6th Cir. 2010). However, pursuant to the FTCA, the United States Government has consented to be sued

> for money damages . . . for . . . personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1); *see also Premo*, 599 F.3d at 544 (6th Cir. 2010) (citing *Richards v. United States*, 369 U.S. 1, 6 (1962)). The term "employee of the Government" includes "officers or employees of any federal agency." *Logue v. United States*, 412 U.S. 521, 526 (1973). Here, it is not disputed that Harms may proceed under the FTCA.

Because the FTCA does not create a cause of action in itself, courts apply a two-step analysis to determine liability and damages. First, "the district court applies local law to determine liability and to assess damages." *Premo*, 599 F.3d at 545 (quoting *Palmer v. United States*, 146 F.3d 361, 366 (6th Cir. 1998)). Second, "federal law is invoked to bar proscribed recoveries, such as punitive damages." *Id.* "[L]ocal law" means the law of the state where the accident occurred. *Brown v. United States*, 583 F.3d 916, 920 (6th Cir. 2009). In this case, the accident in question occurred on a Michigan highway and therefore, Michigan law governs this

Court's determination of liability and damages. Under Michigan's No-Fault Act, "tort liability for non-economic loss arising out of the ownership, maintenance, or use of a qualifying motor vehicle is limited to a list of enumerated circumstances." *McCormick v. Carrier*, 795 N.W.2d 517, 523 (Mich. 2010) (citing Mich. Comp. Laws § 500.3105(3)). And the Act defines a threshold requirement for any such action in tort: "the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement." Mich. Comp. Laws § 500.3135(1); *see also Horan v. Brown*, 384 N.W.2d 805, 806–07 (Mich. 1986). The statute defines "serious impairment of body function" as "an objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life." Mich. Comp. Laws § 500.3135(5). As the Michigan Supreme Court explained in *McCormick*, "On its face, the statutory language provides three prongs that are necessary to establish a 'serious impairment of body function': (1) an objectively manifested impairment (2) of an important body function that (3) affects the person's general ability to lead his or her normal life." 795 N.W.2d at 526.

Although the statute provides a framework for determining whether a claimant has suffered a serious impairment of bodily function or permanent serious disfigurement, *see* Mich. Comp. Laws § 500.3135(2), it is unclear whether this framework has any application in federal court. In a diversity case, for example, under the *Erie* doctrine, the federal court would "apply Michigan state substantive law and federal procedural law." *Lofgren v. AirTrona Canada*, No. 16-1804, —F. App'x—, 2017 WL 384876, at *3 (6th Cir. Jan. 27, 2017) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). The Sixth Circuit has already found that *part* of this framework—the portion of § 500.3135(2)(a)(ii) that specifies when a "question of fact for the jury is created" on the issue of closed head injuries—is a procedural rule that a federal court

should not apply in lieu of Federal Rule of Civil Procedure 56 when sitting in diversity. *See Shropshire v. Laidlaw Transit, Inc.*, 550 F.3d 570, 573 (6th Cir. 2008). Yet the Court's observations in reaching that conclusion appear to suggest that the Court viewed *all* of subsection (2)(a) as procedural rather than substantive. *Id.* ("It appears from the language of the closed-head injury provision, and, for that matter, *subsection (2)(a) as a whole*, that its purpose is to allocate decision-making authority between the judge and jury, a quintessentially procedural determination." (emphasis added)); *see also Barlow v. Adams*, 398 F. App'x 164, 165 (6th Cir. 2010) (holding that the district court should have applied Rule 56 instead of subsection 2(a) as the summary-judgment standard). Moreover, the parties cite general negligence law instead of the statutory framework. *See, e.g.*, *Black v. Shafer*, 879 N.W.2d 642, 642 (Mich. 2016) ("(1) the defendant owed a duty to the plaintiff, (2) the defendant breached that duty, (3) the defendant's breach was a proximate cause of the plaintiff's injuries, and (4) the plaintiff suffered damages.") (citation omitted); *see also Mielke v. Waterman*, 377 N.W.2d 328, 329 (Mich. Ct. App. 1985) (applying these elements in an auto negligence action pursuant to the No-Fault Act). For all these reasons, the Court will analyze whether Harms can establish causation based on the standards required by Federal Rule of Civil Procedure 56.

## A.

The parties do not dispute that "causation" for the purpose of this case means "proximate causation." The Michigan Supreme Court has defined proximate cause as "that which in a natural and continuous sequence, unbroken by any new, independent cause, produces the injury, without which such injury would not have occurred." *Black*, 879 N.W.2d at 642. Even if a plaintiff has a pre-existing medical condition, "recovery is allowed if the trauma caused by the accident triggered symptoms from that condition." *Wilkinson v. Lee*, 617 N.W.2d 305, 308

(Mich. 2000). But a plaintiff's own statements regarding increased aggravation of a preexisting condition are "insufficient to create a fact question on the issue of causation." *Carpenter v. Knight*, No. 257581, 2006 Mich. App. LEXIS 753, at *4 (Mich. Ct. App. Mar. 21, 2006) (citing *Quinto v. Cross & Peters Co.*, 547 N.W.2d 314 (1996)).

Defendant has discharged its initial summary-judgment burden of showing that the accident was not the proximate cause of Harms' current spinal issues.

First, it is undisputed that Harms experienced neck and back issues prior to the accident. Specifically, between September 2009 and February 2014 (shortly before the accident), Harms treated with Klimkowksi for "cervical strain" and "lumbar strain." Her September 2011 MRI revealed a herniated disc. Shortly before the accident, she told Klimkowski that she had been experiencing back pain for the preceding four years. She received multiple work notes during this time, participated in physical therapy, and also took painkillers.

Second, Harms' post-accident care supports Defendants' causation position. Harms did not seek medical attention immediately following the accident, but she did go to the emergency room with neck, thoracic spine, and lumbar spine pain the following evening. (R. 24-12, PID 221.) But Harms also refused pain medication at this time and the ER doctor noted that while she had some neck tenderness, she had a normal range of motion in her back and musculoskeletal system. (R. 24-12, PID 223.) Moreover, Harms' follow-up visits with Klimkowski on February 24, 2014, and March 7, 2014, appeared to be primarily concerned with Harms' ankle pain. (R. 24-7, PID 195, PID 204.)

Third, Defendant's experts have concluded that Harms' spinal issues were not caused by the accident. Dr. Albert King opined that Harms' post-accident MRI showed that her disc protrusion at L5-S1, first noted in the September 2011 MRI, was *less* prominent after the

accident. (R. 24-19, PID 249.) Thus, King concluded that "Harms' post-operative pain is due to a continuing accelerated degenerative process in her spine, including arthritis in her facet joints," and "not caused by the accident on February 19, 2014." (*Id.*) Defendant also points out that Harms' 2014 and 2015 MRI results showed "progression of degenerative changes," including "posterior annular bulging with bilateral facet degeneration and ligamentum hypertrophy." (R. 24-20, PID 251.) Defendant's expert Dr. Daniel K. Park opined that the MRI results in 2015 showed changes that were "likely a progression of degenerative changes," and that Harms' lumbar and cervical pain "is caused by degenerative changes unrelated to the accident and was not caused or significantly exacerbated by the accident." (R. 24-16, PID 237–38.) Similarly, King opined that the force of the accident was insufficient to cause or exacerbate Harms' cervical herniation. (R. 24-19, PID 249.)

For at least these three reasons, Defendant has discharged its initial summary-judgment burden on causation and has shifted the burden of production to Harms.

**B.**

Before examining whether Harms has carried her burden of production, the Court must address a threshold issue. Harms says that the causation question must go to the jury because of certain statements or notes by Drs. Klimkowski, Kornblum, and Babcock. But Defendant says that any causation opinion from Klimkowski, Kornblum, or Babcock is inadmissible because Harms failed to provide the required disclosures pursuant to Federal Rule of Civil Procedure 26(a). (R. 27, PID 439.) The Court agrees in part with Defendant.

Rule 26(a) identifies three categories of potential witnesses, and each category triggers a different level of mandatory disclosure during discovery. *See McFerrin v. Allstate Prop. & Cas. Co.*, 29 F. Supp. 3d 924, 930 (E.D. Ky. 2014). As relevant here, the rule differentiates between

retained expert witnesses and "may call as expert" witnesses. Fed. R. Civ. P. 26(a)(2)(A)–(B). If a party "may use [a witness] at trial to present evidence under Federal Rule of Evidence 702, 703, or 704, the party must disclose (i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C). By contrast, if an expert is "one retained or specially employed to provide expert testimony" or "one whose duties as the party's employee regularly involve giving expert testimony," that witness "must provide a written report." Fed. R. Civ. P. 26(a)(2)(B).

So in order to evaluate Defendant's disclosure argument, the Court must first determine whether Klimkowski and Kornblum are retained or "may call" experts and then decide whether the corresponding disclosure requirement has been met.

Kornnblum and Klimkowski are Harms' treating doctors. They did not prepare expert reports. After the 2010 Amendments to the Federal Rules of Civil Procedure, "When treating physicians are called as experts, they 'usually do not trigger' the requirement to submit an expert report." *Buffman v. United States*, No. 13-cv-14024, 2017 U.S. Dist. LEXIS 50884, at *13 (E.D. Mich. Apr. 4, 2017); *see also Fielden v. CSX Transp., Inc.*, 482 F.3d 866, 871 (6th Cir. 2007). But "there is no reason to conclude that Rule 26(a)(2)(C) was intended to allow treating physicians to give expert opinions that go beyond the scope of treatment and diagnosis without having to prepare a report with respect to those further opinions." *Avendt v. Covidien Inc.*, 314 F.R.D. 547, 556 (E.D. Mich. 2016) (citation omitted). Therefore, "if the testimony goes 'beyond the scope of treatment and diagnosis' of the patient treated by the witness, then an expert report is required." *Buffman*, 2017 U.S. Dist. LEXIS 50884, at *13.

If an expert report is not required, the treating doctor "may both testify as a fact witness and also provide expert testimony under Evidence Rule 702, 703, or 705. Frequent examples include physicians . . . Parties must identify such witnesses under Rule 26(a)(2)(A) and provide the disclosure required under Rule 26(a)(2)(C). The (a)(2)(C) disclosure obligation does not include facts unrelated to the expert opinions the witness will present." *Hinkle v. Ford Motor Co.*, No. 3: 11-24-DCR, 2013 U.S. Dist. LEXIS 67440, at *4–6 (E.D. Ky. May 13, 2013).

To summarize, if a treating physician is merely testifying within the confines of his treatment and diagnosis, then he is subject to the more limited disclosure requirement of Rule 26(a)(2)(C). But if his opinions go beyond treatment and diagnosis, then the more complete expert report under Rule 26(a)(2)(B) is required.

**1.**

Starting with Klimkowski, the Court concludes that his causation opinion arose as part of his diagnosis and treatment of Harms' neck and back pain and so he is a witness contemplated by Rule 26(a)(2)(C). Factors relevant as to whether causation testimony goes beyond the scope of treatment and diagnosis include:

> (1) whether the physician reached his conclusion at the time of treatment; (2) whether the opposing party would be surprised by the testimony; (3) whether the condition at issues leaves room for debate as to the specific ailment and its sources; (4) whether the physician relied upon ordinary medical training in drawing his conclusion; and (5) whether the physician will rely on tests, documents, books, videos, or other sources not relied upon during treatment.

*Gaspar v. Dicks*, No. 08-13707, 2011 U.S. Dist. LEXIS 136571, at *11 (E.D. Mich. Nov. 29, 2011).

Klimkowski's notes from a June 12, 2014 visit reflect that the "chief complaint" that day was to "go over AAA paperwork for MVA [motor vehicle accident]." (R. 26-3, PID 294.) Klimkowski commented, "The etiology is s/p [status-post] mva. This condition is injury related.

The injury occurred 4 month(s) ago during a motor vehicle accident. The injury resulted from trauma." (*Id.*) Working backwards from that date, Klimkowski's notes of March 19, 2014, relate that Harms had stated, "my middle back and low back is killing me since the accident (2/19/2014)." (*Id.* at PID 298.) Finally, on February 24, 2014, at Harms' first post-accident visit ("f/u from car accident"), Klimkowski noted that although the "xrays didn't show anything" at the ER, she had a headache, right shoulder, and right neck pain since the accident. (R. 26-3, PID 306.) This was a change from her February 3, 2014 visit—on that day, while she reported "back pain, described as dull and aching starting 4 years ago," no neck pain, shoulder pain, or headaches were reported. (R. 26-3, PID 312.) Moreover, it is not disputed that Klimkowski eventually referred Harms to Kornblum for treatment of her neck and back problems after the accident, implying that he perceived some increased intensity after the accident. Though Klimkowski treated Harms for back pain for a number of years before the accident, his treatment notes related her February 2014 flare-up directly to the car accident rather than to her prior issues. Additionally, it appears that he performed exams such as an "inspection/palpation" of her mid-thoracic, lower mid-thoracic, and mid-lumbar spine, and prescribed Vicodin, based on the new reports of pain. (R. 26-3, PID 299.)

So the question becomes whether Harms has complied with Rule 26(a)(2)(C) with regard to Klimkowski. The answer is "no." It is undisputed that Harms' only disclosure regarding Klimkowski's causation opinion was production of his clinical notes. Though these notes did contain some hints that Klimkowski would testify to causation, they are not enough to satisfy the Rule 26(a)(2)(C) disclosure requirement. *See, e.g.*, *McFerrin v. Allstate Prop. & Cas. Co.*, 29 F. Supp. 3d 924, 932 (E.D. Ky. 2014) ("The fact that the other party already knows of a potential witness or has a document, does not, by itself, achieve a critical purpose of the Rule 26(a)(1)(A)

disclosures, which is to inform the other parties which witnesses and documents the disclosing party may use to support its claim or defenses." (quoting Fed. R. Civ. P. 26, Practice Commentary)). Plaintiff has not cited any cases, and the Court has not found any, that suggest that merely producing medical records is a proper disclosure under Rule 26(a)(2)(C). In fact, "case law indicates precisely the opposite—that the mere production of medical records does not satisfy subsection (C) disclosure requirements." *Gleed v. AT&T Servs.*, No. 13-12479, 2016 U.S. Dist. LEXIS 49295, at *14 (E.D. Mich. Apr. 12, 2016) (collecting cases).

Even though Harms has failed to make the required summary disclosure of Klimkowski's causation opinion, the Court might still consider the opinion if the failure to disclose was "substantially justified or harmless." Fed. R. Civ. P. 37(c). Harms has offered no argument on this issue. And the Court does not find that the failure to make the required disclosure was "substantially justified"—Harms listed Klimkowski as a "may call as expert" witness on her witness list, which also shows that Harms should have been on notice that a heightened disclosure requirement would apply. (R. 16, PID 57.) Moreover, the failure to disclose was not harmless. Defendant indicates that "[h]ad Harms provided a disclosure, Defendant would have deposed Dr. Klimkowski[.]" (R. 27, PID 440.) And given that proximate causation is the focus of Defendant's motion, the Court does not doubt that had the proper disclosure been provided, Defendant would have indeed deposed Klimkowski.

Accordingly, the Court will limit Klimkowski's testimony for purposes of this motion and at trial to "the course of treatment and to what he directly observed while [Harms] was under his care." *McFerrin*, 29 F. Supp. 3d at 934. That is, Klimkowski cannot testify to causation in this case. *See Gleed*, 2016 U.S. Dist. LEXIS 49295 at *18; *Carrillo v. B&J Andrews Enters.,*

*LLC*, No. 2:11-cv-01450-RCJ-CWH, 2013 U.S. Dist. LEXIS 12435, at *20 (D. Nev. Jan. 29, 2013).

**2.**

The Court concludes that Kornblum's causation opinion fell within his treatment of Harms and so, like Klimkowski, Kornblum is a Rule 26(a)(2)(C) witness. Kornblum opined at his deposition as follows: "according to the history that Ms. Harms provided to me, there was a car accident that caused this onset of symptoms even though she had a prior history of back problems as well." (R. 24-6, PID 191.) Kornblum explained that he was able to isolate her current complaints to the L5-S1 disk. (*Id.*) While he was aware of Harms' history of back pain and knew that she "already had a bad L5-S1 disk," the worsening could not have been a result of the degenerative process because "the MRI showed that it look[ed] better after the accident." (*Id.*) Rather, Kornblum concluded,

> in this case she had a narrowing of her spinal canal where that nerve was [due to the degenerative process]. When you have a narrowing that's preexisting, you're more susceptible to injury. That is, when you have a car accident or some other injury, there is nowhere for that nerve to go, there is no reserve or there is no space for the nerve to be able to cushion from an injury. So the fact the nerve was already compressed or tight to begin with I think allowed for the nerve to be primarily injured.

(*Id.*) Accordingly, what Kornblum "did for her [was] . . . giv[e] her somewhat more room for the nerve as well as stabilizing where the nerve was." (*Id.*) Indeed, Kornblum testified that he thought that the accident "[was] responsible for [Harms] becoming symptomatic[.]" (*Id.* at PID 192.) Accordingly, it appears that Kornblum's assessment that Harms' pain was accident-related impacted how he treated the affected disk. *See In re Aredia & Zometa Prods. Liab. Litig.*, No. 3-06-MD-1760, 2010 U.S. Dist. LEXIS 129339, at *12 (M.D. Tenn. Dec. 7, 2010) (declining to require an expert report where "Dr. Roser's causation opinion was developed during his care and

treatment of Ms. Eberhart. It was a part of his working diagnosis and a basis for his treatment of her.").

Although it is undisputed that Harms did not make a formal Rule 26(a)(2)(C) disclosure, she argues that Kornblum's deposition should be sufficient. Here, the Court need not decide whether disclosure of an opinion at a deposition complies with Rule 26(a)(2)(C). Even assuming it does not, there is still the question whether the failure was "substantially justified or harmless." Fed. R. Civ. P. 37(c).

Given that the deposition occurred prior to the close of discovery and Defendant could have sought leave to re-depose Kornblum, the Court finds that Harms' failure to properly disclose Kornblum's opinion was harmless. Therefore, the Court will not exclude Kornblum's causation testimony based on the Rule 26 violation. But the Court will also grant Defendant leave to re-depose Kornblum prior to trial (at Plaintiff's expense), and to make any motion it deems appropriate should additional information related to Kornblum's expert opinion arise at the deposition.

Defendant also argues that even if Kornblum's opinion was properly disclosed, it is not proper expert testimony pursuant to Federal Rules of Evidence 702 and 703. (R. 27, PID 442.) Defendant is correct that "even if allowed as properly within the scope of his treatment, testimony of a treating physician is not immune to *Daubert*." *Berman v. Unimin Corp.*, No. 15-1255, 2016 U.S. Dist. LEXIS 172769, at *10 (W.D. Tenn. Dec. 14, 2016) (citing *In re Aredia & Zometa Prods. Liab. Litig.*, 483 F. App'x 182, 187 (6th Cir. 2012); *Avendt v. Covidien Inc.*, 314 F.R.D. 547, 561 (E.D. Mich. 2016)).

"In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, (1993), the Supreme Court established guidelines for district courts to use in determining the admissibility of expert

testimony pursuant to Rules 702 and 104 of the Federal Rules of Evidence[.]" *Pride v. BIC Corp.*, 218 F.3d 566, 576 (6th Cir. 2000); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). "In essence, Daubert and its progeny have placed the district courts in the role of 'gatekeeper,' charging them with evaluating the relevance and reliability of proffered expert testimony with heightened care. In discharging that role, district courts possess broad discretion to make admissibility determinations.'" *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 295 (6th Cir. 2007) (citations omitted).

Under *Daubert*, the party seeking to introduce expert testimony has the burden of showing, among other things, that his expert's opinion is based on a reliable foundation. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008); *Jones v. Pramstalle*r, 874 F. Supp. 2d 713, 718 (W.D. Mich. 2012). Defendant says that Kornblum cannot testify as an expert under Rule 702 because his causation opinion "is not based on a reliable foundation." (R. 24, PID 121.) Again, at his deposition, Kornblum testified as follows:

> if [Harms'] history is accurate, and I can't verify that independently, but if she was having improvement for that last four years and working without any limitations and then having this injury caused the symptoms that were confirmed by an EMG study, then I think therefore the accident is responsible for her becoming symptomatic, because I can't say it caused any new structural abnormalities.

(R. 24-6, PID 192.) However, Kornblum admitted that his assessment is only based on the information Harms told him, and that he never reviewed any of her medical records from prior to the accident or from the emergency room. (R. 24-6, PID 184.)

Defendant first cites *Smelser v. Norfolk S. Ry.*, 105 F.3d 299, 305 (6th Cir. 1997) for the proposition that a causation conclusion drawn without the benefit of medical history is unreliable. *Smelser* is distinguishable. There, the Sixth Circuit considered whether it was proper

for a biomechanics expert to testify that a seat belt failure caused the plaintiff's spinal injuries. It answered that question in the negative because the expert

> admitted that (1) he was not a medical doctor, had no medical training, and must rely on a medical doctor's opinion to determine a particular individual's injuries; (2) each individual has his or her own tolerance level and pre-existing medical conditions could have an effect on what injuries result from an accident; and (3) *he had not examined Smelser's complete medical history*.

*Id.* (emphasis added). But clearly, the expert in *Smelser* was not a doctor, and his failure to examine plaintiff's medical history was only one factor that motivated the Court's ruling.

And in *Kolesar v. United Agri Products*, 246 F. App'x 977, 981 (6th Cir. 2007), the Court considered a doctor's differential diagnosis and held its methodology to be unreliable— "Dr. Chen's diagnosis cannot be a differential diagnosis because she failed to consider or rule out alternative causes for Kolesar's illness, including his preexisting asthma and long history of cigarette smoking that he had failed to disclose to her."

But the holding in *Kolesar* may be a function of the differential diagnosis model:

> [o]ne appropriate method for making a determination of causation for an individual instance of disease is known as 'differential diagnosis.' [*Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 260 (6th Cir. 2001)] defined differential diagnosis as '[t]he method by which a physician determines what disease process caused a patient's symptoms. The physician considers all relevant potential causes of the symptoms and then eliminates alternative causes based on a physical examination, clinical tests, and a thorough case history.'

*Rolen v. Hansen Bev. Co.*, 193 F. App'x 468, 474 n.4 (6th Cir. 2006) (citation omitted). Thus, the very methodology of a differential diagnosis requires a physician to consider all "relevant potential causes," including a plaintiff's medical history. But this case did not involve a differential diagnosis model.

And in other contexts not involving the differential diagnosis model, the Sixth Circuit has allowed expert physician testimony without a full review of a plaintiff's medical records:

> Medical diagnoses and treatments are . . . commonly and appropriately made without the luxury of detailed medical histories. Opinions rendered on questions of health, possible causes of maladies, and their treatments are, nevertheless, still routinely offered in federal courts pursuant to the standards of Federal Rules of Evidence 702 and 703. In those instances, as in this case, the incomplete bases for the expert testimony are subject to the crucible of cross-examination and affect the weight properly given to the scientific or medical evidence, not the admissibility of such information at trial.

*Laski v. Bellwood*, No. 96-2188, 1997 U.S. App. LEXIS 34117, at \*11–12 (6th Cir. Nov. 26, 1997).

The Third Circuit has applied similar logic to automobile accident cases. In *Matlin v. Langkow*, 65 F. App'x 373, 384 (3d Cir. 2003), a treating doctor "examined [plaintiff], and, given [plaintiff's] statement to him about the automobile accident, reached the conclusion that the injury he diagnosed had been caused by the automobile accident." Though the doctor did not have the benefit of plaintiff's medical history, the panel held that it was not an abuse of discretion to allow him to testify as a causation expert:

> "To provide a simplistic example, imagine a patient who comes in with medical records that include x-rays showing a fractured arm and who tells the doctor that he hurt the arm in a biking accident; the doctor could reliably conclude that the patient had a fractured arm caused by a biking accident even without physically examining the patient or taking a medical history. The biking accident is so much more likely to have been the cause of the fracture than anything else that there is no need to examine alternatives."

65 F. App'x at 384 (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 759–60 (3d Cir. 1994)). Although not discussing the bicycle example, the Sixth Circuit has adopted *In re Paoli*'s test for the reliability of differential diagnoses. *See Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 180 (6th Cir. 2009).

Given *Laski*, the Court finds *Paoli* and *Matlin* instructive. *See also Bach-Tuyet Chau v. NCL (Bah.) Ltd.*, No. 16-21115-CIV, 2017 U.S. Dist. LEXIS 68330, at \*32 (S.D. Fla. May 3, 2017). Harms was referred to Kornblum as a result of increased neck and back pain. Even though

she had a history of such pain, she reported that it became worse in February 2014—the same time as the accident. Moreover, Kornblum's treatment notes of April 11, 2014 indicate that he had at least reviewed Harms' March 2014 MRI and a prior MRI before starting treatment. (R. 24-6, PID 184.) And Kornblum himself testified that knowing more of Harms' history would not have changed his opinion in this case, which suggests that this situation is closer to *Matlin* and *Laski* than it is to *Kolesar*. Accordingly, the Court will not exclude his opinion under Rule 702.

**3.**

A footnote in Defendant's reply brief also seeks to preclude opinion testimony by Dr. Babcock, who conducted an independent medical examination at the request of Harms' no-fault insurer (R. 26-5, PID 330), and Dr. Mendelson, who treated Harms for concerns about her left knee in April 2014 and November 2015. (R. 26-6, PID 392–94). The Court will not address these issues at this time. *Sundberg v. Keller Ladder*, 189 F. Supp. 2d 671, 682–83 (E.D. Mich. 2002) ("[I]t is not the office of a reply brief to raise issues for the first time." (citing *United States v. Perkins*, 994 F.2d 1184, 1191 (6th Cir. 1993))).

* * *

To summarize, Plaintiff may rely on Klimkowski as a fact witness only. *See Hinkle v. Ford Motor Co.*, Civil Action No. 3: 11-24-DCR, 2013 U.S. Dist. LEXIS 67440, at *15 (E.D. Ky. May 13, 2013) (citing *Fielden*, 482 F.3d at 871). Plaintiff may rely on Kornblum as both a fact and expert witness because the failure to disclose his opinion was harmless, and his causation opinion was not unreliable pursuant to *Daubert*. At this stage of the case, Plaintiff may also rely on any opinions by Babcock and Mendelson.

## C.

With these evidentiary limitations in mind, the Court returns to the question of whether Harms has established a genuine issue of material fact as to proximate cause. The Court believes she has.

"A tortfeasor takes a victim as the tortfeasor finds the victim and will be held responsible for the full extent of the injury, even though a latent susceptibility of the victim renders the injury far more serious than reasonably could have been anticipated." *Wilkinson v. Lee*, 617 N.W.2d 305, 308 (Mich. 2000). "A degenerative condition can be exacerbated by subsequent injury such that it constitutes an impairment of a body function." *Rudder v. Easter*, No. 330165, 2017 Mich. App. LEXIS 20, at *9 (Mich. Ct. App. Jan. 10, 2017) (citing *Washington v Van Buren County Road Comm'n*, 400 NW2d 668 (Mich. Ct. App. 1986)). However, a plaintiff's bare assertions that pain levels increased following an accident are usually not sufficient to create a fact issue in this regard. *See, e.g.*, *McLaren v. Emcasco Ins. Co.*, No. 277582, 2009 Mich. App. LEXIS 652, at *2 (Mich. Ct. App. Mar. 17, 2009); *Carpenter v. Knight*, No. 257581, 2006 Mich. App. LEXIS 753, at *2 (Mich. Ct. App. Mar. 21, 2006); *Lindahl v. Rubright*, No. 245568, 2004 Mich. App. LEXIS 2003, 2004 WL 1620847 (Mich. Ct. App. July 20, 2004).

But Harms has more than just her subjective reports. Klimkowski, in the course of his treatment of Harms, concluded that she suffered increased neck and back pain after the accident—even though he was aware that Harms had at least some history of back pain. *Cf. Rudder v. Easter*, No. 330165, 2017 Mich. App. LEXIS 20, at *10 (Mich. Ct. App. Jan. 10, 2017) (affirming a grant of summary judgment even where two doctors had opined that a car accident cause plaintiff's back and neck pain because those doctors specifically articulated that their opinions were based on the incorrect assumption that plaintiff had no history of back or

neck pain whatsoever). Indeed, Klimkowski referred Harms to Kornblum after the accident to treat the increased pain. Moreover, though Harms had a history of back pain, she had been discharged from physical therapy years prior to the incident. While Harms did take Motrin after being discharged from physical therapy, she testified that she needed more pills after the accident. (R. 24-2, PID 145.) And according to Kornblum, an acute event such as a car accident would have been especially traumatic to a person like Harms, whose nerves had nowhere to retreat upon impact and therefore were exposed to the full force of the accident. Kornblum also found that Harms had a narrowing of her spinal canal where that nerve was" due to the degenerative process, which meant that when the accident occurred, "there [was] no space for the nerve to be able to cushion from an injury." (*Id.*)

And even if no jury could find that Harms' back problems were exacerbated by the accident, this ignores Harms' neck pain. Harms had no real history of neck pain before the accident (other than one passing reference to some neck pain in September 2009).

This case is similar to *Contreras v. United States*, No. 1:03-CV-360, 2004 U.S. Dist. LEXIS 28329 (W.D. Mich. Oct. 26, 2004). In that case, plaintiff was rear-ended by a Postal Service truck and filed suit, claiming that the accident caused neck and spine pain. *Id.* at *2. However, plaintiff was already suffering from degenerative spinal issues. *Id.* Her doctors concluded that while the plaintiff's symptoms might have been the result of malingering, there was no way to objectively determine the extent to which the accident affected or exacerbated her underlying condition. *Id.* Applying Michigan law, the court found that plaintiff had established a genuine issue of material fact as to causation: "although the condition was pre-existing, the evidence shows that the condition was asymptomatic prior to the accident . . . but that symptoms began to occur within a short time following the accident." *Id.* at *11. Moreover, the plaintiff's

doctor testified that "trauma can initiate the sequence of events that results in" the symptoms plaintiff experienced.

To summarize, Harms has presented evidence that prior to the accident, she had no neck pain. And her back pain had been controlled via minimal use of painkillers. But after the accident, Harms had neck pain and increased back pain, which she reported to Klimkowski, who referred her to Kornblum. And Kornblum has opined that the car accident caused the increased pain Harms experienced afterward. A jury could find that the car accident caused the exacerbation of Harms' back issues or caused her cervical spine issues. Accordingly, Defendant is not entitled to summary judgment on this ground.

### D.

Defendant next argues that Harms cannot recover wage loss damages because she has not presented evidence that she will be disabled beyond February 19, 2017, and because she failed to mitigate her wage loss damages.

Michigan law "allows for third-party tort actions for certain kinds of economic damages, specifically '[d]amages for allowable expenses, work loss, and survivor's loss . . . in excess of the daily, monthly, and 3-year limitations contained in' the sections applicable to those three types of no-fault benefits." *Hannay v. DOT*, 860 N.W.2d 67, 85–86 (Mich. 2014) (citing Mich. Comp. Laws § 500.3135(3)(c)). The section applicable to work loss states that "personal protection insurance benefits are payable for . . . . Work loss consisting of loss of income from work an injured person would have performed during the first 3 years after the date of the accident if he or she had not been injured." Mich. Comp. Laws § 500.3107(1)(b). The burden is on the plaintiff to prove such damages. *Hannay*, 860 N.W.2d at 86. Accordingly, Harms must show that she had work loss damages "extend[ing] beyond the three-year limit in the no-fault

statute," in this case, beyond February 19, 2017. *Reed v. Jones*, No. 2:16-CV-34, 2016 U.S. Dist. LEXIS 161667, at *7 (W.D. Mich. Nov. 22, 2016).

Harms has not provided such evidence. Kornblum testified that he would estimate that Harms would be "at her best" within "a year or year and a half" from her March 2016 surgery. (R. 24-6, PID 190.) By "her best," he stated that he meant doing things "such as jump[ing] out of airplanes, go[ing] on a rollercoaster." (*Id.*) But "[f]or her job as a custodian, it could be sooner." (R. 24-6, PID 190.) And he stated that as of the date of his deposition, Harms could "possibl[y]" do a "light duty, desk work [job] for a limited number of hours . . . now." (*Id.*) Harms argues that it is unclear what Kornblum meant by "limited hours." (R. 26, PID 286.) But loss-of-earning-capacity claims (i.e., what a person could have earned) are not recoverable under the no-fault act. *Ouellete v. Kenealy*, 378 N.W.2d 470, 472 (Mich. 1985). And while Harms testified that she could not go back to work, her deposition was taken on August 1, 2016—within the three year period, and before Kornblum's estimate of when she could return to work. (R. 24-2, PID 131.) And Harms has no other evidence of wage loss after February 19, 2017.

Moreover, even assuming that Harms could show work loss after February 19, 2017, "An injured party is not automatically entitled to work-loss benefits by simply proving that he is unable to return to his own job due to a motor vehicle accident. Under both tort law and the No-Fault Act, the plaintiff has a duty to mitigate damages." *Mathis v. Encompass Ins. Co.*, No. 06-CV-13837, 2008 U.S. Dist. LEXIS 6202, at *30–31 (E.D. Mich. Jan. 29, 2008) (citing *Bak v. Citizens Ins. Co. of America*, 503 N.W.2d 94 (1993)). Harms did not respond to this assertion. And Harms admitted at her deposition that she has not sought any work accommodations from Centerline Schools, nor applied to any other jobs since November 2014. (R. 24-2, PID 146.) Accordingly, the Court finds that "[f]uture wage loss damages under the instant circumstances

are too remote, contingent, and speculative to sustain an award." *Mathis v. Encompass Ins. Co.*, No. 06-CV-13837, 2008 U.S. Dist. LEXIS 6202, at *32 (E.D. Mich. Jan. 29, 2008).

Defendant is entitled to summary judgment on Harms' claim for wage loss damages.

**E.**

Lastly, Defendant argues that Harms' surgical scars are not "permanent serious disfigurements" so as to surpass the No-Fault Act's threshold to recover noneconomic damages. As noted above, while the statute provides a framework to evaluate such an argument, the Court will analyze the issue pursuant to the standards set forth in Federal Rule of Civil Procedure 56.

"Whether an injury amounts to a permanent serious disfigurement depends on its physical characteristics rather than its effect on the plaintiff's ability to live a normal life." *Kosack v. Moore*, 375 N.W.2d 742 (Mich. 1985). Michigan courts generally look to the shape, size, and pigmentation of a scar, rather than subjective factors such as "embarrassment and sensitivity" in order to evaluate seriousness. *See, e.g.*, *Nelson v. Myers*, 381 N.W.2d 407, 408 (Mich. Ct. App. 1986).

In this case, Harms' scars are not permanent serious disfigurements. Harms has one five-centimeter scar on her neck, and a scar of indeterminate length on her stomach. (*See* R. 24-21, PID 253–54; R. 26-6, PID 347.) Michigan courts and courts applying Michigan law have rejected as "not serious" scars of a similar size, *see Nelson*, 381 N.W.2d at 408; *Luther v. Stoeckle*, No. 280772, 2008 Mich. App. LEXIS 891, at *5 (Mich. Ct. App. May 1, 2008), and in more obvious locations, *see Krause v. United States*, No. 1:13-cv-00693-PJG, 2015 U.S. Dist. LEXIS 47985, at *17 (W.D. Mich. Apr. 13, 2015); *Minter v. City of Grand Rapids*, 739 N.W.2d 108, 121 (2007) (Murray, J., dissenting), dissenting opinion adopted in 747 N.W.2d 229 (Mich. 2008). And while the scars do appear to be darkly pigmented, the photos are undated, and it is

unclear whether the scars might fade over time. *Cf. Martin v. Interstate Brands Corp.*, No. 247727, 2005 WL 2291745 (Mich. Ct. App. Sept. 20, 2005).

Accordingly, the Court concludes that Harms' scars are not permanent serious disfigurements as a matter of law. Defendant is entitled to summary judgment as to the scars.

## IV.

For the reasons set forth above, the Court GRANTS IN PART and DENIES IN PART Harms' motion for summary judgment. Harms can proceed to trial as to her claim for noneconomic damages based on her neck and back issues, but her claims for wage loss and noneconomic damages based on her scars will be dismissed.

Additionally, the Court GRANTS Defendant leave to re-depose Dr. Kornblum prior to trial, and, if warranted, GRANTS Defendant leave to file a subsequent motion based on Kornblum's testimony at his second deposition. Any witness fees and costs associated with this deposition shall be paid by the Plaintiff.

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
Dated: August 24, 2017                          U.S. DISTRICT JUDGE

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 24, 2017.

s/Keisha Jackson
Case Manager